**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John England MORRIS, Jr., a/k/a Larry Jackson, Defendant-Appellant.**

**No. 72–2224.**

United States Court of Appeals,
Fifth Circuit.

April 17, 1973.

Rehearing and Rehearing En Banc
Denied May 21, 1973.

---

Robert Glass, New Orleans, La., Court-appointed for defendant-appellant.

Gerald J. Gallinghouse, U. S. Atty., Robert S. Leake, Asst. U. S. Atty., New Orleans, La., Mervyn Hamburg, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GEWIN, Circuit Judge:

John England Morris was convicted of possessing a fully automatic rifle that had not been registered to him in the National Firearms Registration and Transfer Record, a violation of 26 U.S. C. §§ 5861(d) and 5871. Morris challenges his conviction on two grounds. He first argues that the evidence against him should have been suppressed because its seizure was incident to an unlawful arrest. His second argument is that as applied to him the registration provisions of the National Firearms Act violate his constitutional privilege against compulsory self-incrimination. We find both of Morris' claims to be without merit and affirm the judgment of the district court.

Early in the morning of November 26, 1970, a bizarre sequence of events unfolded at the Desire Housing Project, a public housing unit owned and operated by the New Orleans Housing Authority. At that time an abscure organization calling itself the National Committee to Combat Fascism (NCCF) was located in the Desire Project at 3315 Desire Parkway, Apartment A. This apartment served not only as the headquarters of NCCF but also as the residence of some, if not all, of its members. The record does not reveal how NCCF's members came to be in possession of the apartment, but it does disclose that the apartment's owner, the New Orleans Housing Authority, considered their presence on the premises unlawful.

In any event on November 26 at 1:20 a. m. a group of New Orleans police officers wearing disguises arrived in the vicinity of Apartment A. Their purpose was to execute warrants for the arrest of Betty Powell and Godthea Cooper, known to be living in Apartment A, and to remove anyone else found on the

premises. While three of the officers positioned themselves so that they could not be observed by the apartment's inhabitants, three others attired in clerical dress approached the apartment and knocked on the door. Before receiving any response, they heard the sounds of weapons being loaded and a heavy object being moved in front of the door. Someone then peered out at them through a small peephole, and a voice asked, "Who is it?"

One of the officers identified himself as "Father Coy" and asked to speak with Godthea Cooper. The door was opened, and the officers were confronted by Cooper and another person later identified as Leon Lewis. Betty Powell was observed standing in the background. A conversation ensued during which the officers pretended to be clergymen eager to assist the apartment's occupants in arranging bond for friends of theirs who had been arrested on the preceding day. They attempted to induce Cooper and her friends to leave the apartment and accompany them to the police station.

After some twelve minutes of fruitless persuasion, another officer disguised as a postman appeared and said that he had a letter for one of the apartment's occupants. Leon Lewis came forward to examine the letter. At this time two more officers dressed in civilian clothes emerged from their hiding places and advanced toward the apartment. When Lewis noticed these new arrivals, he apparently recognized them as police officers, for he shouted, "Pigs! Watch out" and began trying to slam the door shut. A commotion erupted as one of the officers announced "Police", another grabbed Cooper, and the rest forced their way into the apartment. As they entered, they were met by outbursts of gunfire which they returned in kind. The gunfight lasted for about a minute until Betty Powell cried out that she had

been hit. The occupants of the apartment were ordered to come out with their hands up and upon doing so were placed under arrest. Appellant Morris was found kneeling on the living room floor with an automatic rifle in his hands. Shots had emanated from the position where Morris was found. He was arrested, and the rifle was seized.[1]

An evaluation of the legality of Morris' arrest and the seizure of his weapon cannot be made without first examining the circumstances which led the police to devise and execute such an elaborate ruse for the arrest of the apartment's inhabitants. On November 18, 1970 Officer Williams of the Police Department had obtained warrants for the arrest of Betty Powell and Godthea Cooper. In a sworn affidavit Williams stated that:

". . . Betty Powell did . . . commit the crime of criminal trespass by the unauthorized and intentional taking possession of the structure known as 3315 Desire Parkway, Apartment A, without the consent of the Housing Authority of New Orleans, the owners of said property, by making application for and paying the deposit of $35.00 for the installation of a phone at 3315 Desire Parkway, Apartment A. The phone was installed by South Central Bell on October 29, 1970. *These facts were verified by affiant by checking the records of South Central Bell and the affidavit of the illegal unauthorized entry and taking possession of made by the Chairman of the Board of the Housing Authority of New Orleans.*" (emphasis added)

In a second affidavit Williams similarly alleged that Godthea Cooper had committed the crime of criminal trespass by occupying Apartment A without the consent of the New Orleans Housing Authority. He knew this because:

"On November 16, 1970 a registered letter was mailed via the U.S. Post

1. Morris' automatic rifle was not the only weapon found in the apartment by the officers. After arresting the apartment's occupants, the officers also seized another rifle, several shotguns and some ammunition.

Office to the occupant of 3315 Desire Parkway, Apartment A. On November 17, 1970 the letter was received and a receipt was signed by Godthea Cooper, alias Keefie. On November 18, 1970 said receipt was sent to the New Orleans Police Department by the U.S. Post Office. The fact of the illegal possession was verified by an affidavit executed by the Chairman of the Board of the Housing Authority of New Orleans."

On the basis of these two affidavits warrants for the arrest of Powell and Cooper were issued. At the hearing on appellant's motion to suppress, Williams testified that he never did provide the issuing magistrate with a copy of the Housing Authority's complaint and that despite his statement in the Powell affidavit to the contrary, he had never actually seen the affidavit or verified its existence. He stated that at the time the warrants were obtained he had known of the affidavit's existence because he had probably read about it in interoffice correspondence.

Williams, however, did not participate in the execution of these two warrants on the morning of November 26. The officers who did execute the warrants did so upon the instructions of Superintendent Giarusso of the Police Department. He instructed them to go to Apartment A in order to arrest Powell and Cooper and remove anyone else found on the premises. Although the arresting officers were not given the arrest warrants, they were told that warrants had been secured. They were never shown the complaint in which the Housing Authority charged the apartment's occupants with criminal trespass, but they were informed of its existence by the Superintendent of Police and were told that the Police Department had verified the occupancy of the apartment by Powell and Cooper in the manner described in Williams' affidavits. In addition the officers were shown photographs of the two women they were to arrest.

But the information supplied them by Superintendent Giarusso at this preliminary briefing was not the only information concerning Apartment A and its occupants possessed by the officers who forcibly entered it on November 26. On several occasions prior to November 26 some of these same officers had participated in abortive efforts to execute the warrants and clear the apartment of trespassers. They were accompanied by officials from the Housing Authority, the owner of the apartment, who complained that the people living in the apartment were trespassers and who urged the police to remove them. On these visits the police were not disguised, and they attempted to persuade the apartment's inhabitants to leave peaceably. These prior visits resulted in nothing more than hostile confrontations with the apartment's occupants who were armed and who obdurately refused to leave. It was because of the hostile reception they were accorded that the police concocted the very unusual scheme, the successful execution of which on November 26, culminated in the arrest of Morris and the seizure of his automatic rifle.

The critical question in this appeal is whether the police officers' entry into Apartment A was lawful, for, if so, the subsequent seizure of the automatic rifle held in plain view by Morris was undisputedly proper. As the Supreme Court noted in Harris v. United States: "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." [2] In determining the lawfulness of the officers' entrance into Apartment A, the validity of the arrest warrants obtained by Williams must first be considered; if valid, they justify the officers' entrance into the apartment in order to execute them.

2. 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968).

Questions as to a warrant's validity ordinarily turn upon whether the affidavit underlying it sets forth facts sufficient to establish probable cause. The statements made in the affidavit are presumed to be true. But at the suppression hearing in this case Officer Williams candidly admitted that a statement made by him in the Powell affidavit was erroneous. In that affidavit he swore that he had personally checked the Housing Authority complaint which charged Powell and Cooper with criminal trespass. In fact he had never seen any such affidavit; although unsure, he thought that he had learned of its existence through interoffice memoranda. Thus in his testimony at the suppression hearing Officer Williams inadvertently raised the question of what effect erroneous statements in an affidavit have on the validity of a warrant issued on the basis of that affidavit.[3]

We recently considered this question in United States v. Upshaw.[4] In that case a search warrant was issued upon an affidavit which, it was revealed, contained erroneous statements. When purged of its erroneous statements, the affidavit was wholly lacking in facts sufficient to show probable cause. After careful consideration this Court concluded:

"Once it came to the attention of the court, from the testimony at the motion to suppress hearing, that evidence had been seized on the basis of statements of facts erroneously made by the affiant which struck at the heart of the affidavit's showing of probable cause, the court was required to grant the motion."[5]

A contrary rule would leave the warrant requirement embodied in the fourth amendment open to circumvention by overzealous officials willing to make erroneous affidavits in the hope that the resultant search or arrest will yield conclusive proof of criminal conduct. The warrant procedure operates on the assumption that statements in the affidavit presented to the issuing magistrate are at least an accurate representation of what the affiant knows though possibly inadequate to show probable cause. It would quickly deteriorate into a meaningless formality were we to approve searches or arrests based upon misrepresentation or incorrect factual statements. Thus when an affidavit contains inaccurate statements which materially affect its showing of probable cause, any warrant based upon it is rendered invalid.

In this case as in *Upshaw,* the affidavit underlying the warrant for Powell's arrest contains an erroneous statement.[6] Williams averred that he had personally checked the Housing Authority complaint charging Powell with trespass when in fact he had not. In the absence of this statement, the issuing magistrate had no assurance that such a complaint actually existed. If this critical fact is removed from the Powell affidavit, it contains nothing more than a recitation of entirely innocent acts coupled with the bare assertion that a crime was being committed. Purged of its erroneous statement, it is

---

3. At this point it is important to emphasize that this case does not raise the issue of whether a defendant is entitled to a hearing to test the underlying factual validity of the affidavit on the basis of which a warrant has been issued. This issue has yet to be resolved by the Supreme Court though it has occasioned considerable commentary. *See, e. g.,* Kipperman, Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence, 84 Harv.L.Rev. 825 (1971). In this case a probable cause hearing was conducted during the course of which testimony inadvertently revealed that the Powell affidavit contained an erroneous statement.

4. 448 F.2d 1218 (5th Cir. 1971). *Accord* United States v. Jones, 475 F.2d 723 (5th Cir., 1973).

5. United States v. Upshaw, 448 F.2d 1218, 1222 (5th Cir. 1971).

6. We feel compelled to emphasize that there is nothing in the record which indicates that the erroneous statement in Williams' affidavit was intentionally or wilfully made. Nothing in this opinion is intended to suggest the contrary.

insufficient to support the issuance of an arrest warrant.

Furthermore, Williams' misstatement in the Powell affidavit casts doubt on the accuracy of his affirmation in the Cooper affidavit that a Housing Authority complaint had been filed against Cooper. In the absence of this affirmation the second affidavit is also deficient. In short the unfounded assertion contained in the Powell affidavit materially affected not only its showing of probable cause but that of the Cooper affidavit as well. The arrest warrants issued on the basis provided by these affidavits are therefore invalid and cannot be used to justify the officers' entry into Apartment A.

■ However, it does not necessarily follow from the fact that the arrest warrants were defective that the officers' entrance into the apartment was unlawful. To our knowledge all of the courts that have considered the question have decided that a warrant is not a prerequisite to a lawful arrest. A warrantless arrest is nevertheless valid if the arresting officer has probable cause to believe that the person arrested has committed or is in the act of committing a crime.[7] Therefore in this case the officers' entrance was lawful in spite of the invalid warrants if at the time they entered they had probable cause to believe that Powell, Cooper, or any of its other occupants had committed or were committing a crime.

■ Although probable cause has been defined in a variety of ways, in essence it means nothing more than a reasonable basis for belief of guilt. Enough evidence to support a conviction is not required. Probable cause to ar-

rest exists if, at the moment an arrest is made, the facts and circumstances within the arresting officers' knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent man in believing that the suspect has committed or is committing an offense.[8] In applying this standard for determining the existence vel non of probable cause, it is wise to heed the sound admonition found in Brinegar v. United States:

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."[9]

*Brinegar* instructs us to interpret the probable cause standard in a common sense and realistic fashion, and its teaching has been affirmed time and time again, most recently in Adams v. Williams[10] and United States v. Harris[11].

7. United States v. Wysocki, 457 F.2d 1155 (5th Cir.), cert. denied 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972); United States v. Wilson, 451 F.2d 209 (5th Cir. 1971); Ray v. United States, 412 F.2d 1052 (9th Cir. 1969); United States v. Botsch, 364 F.2d 542 (2d Cir. 1966), and United States v. Hall, 348 F.2d 837 (2d Cir.), cert. denied 382 U.S. 947, 86 S.Ct. 408, 15 L.Ed.2d 355 (1965). *Cf.* United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 94 L.Ed. 653 (1950)

and Ker v. California, 374 U.S. 23, 41–42, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

8. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612, 618 (1972).

9. 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

10. 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612, 618 (1972).

11. 403 U.S. 573, 582–583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). *See* United States v. Banks, 465 F.2d 1235 (5th Cir.,

Reviewing the record compiled in this case with these principles in mind, we are convinced that at the time the arresting officers entered Apartment A they did have probable cause to arrest Powell, Cooper, and its other occupants for criminal trespass. On previous visits to the apartment some of the officers had personally observed Housing Authority officials complain that its occupants were trespassers and request that they be removed. At the briefing they attended on the day preceding the arrests the officers were informed by the Police Superintendent that the Housing Authority had filed an official complaint and that the Police Department had ascertained that Powell and Cooper were definitely living on the premises. When the owner of a dwelling charges its occupants with trespass, it is not unreasonable for prudent police officers at least to suspect that there is some truth in the charges.

The actions of the apartment's occupants strongly tended to confirm the suspicions legitimately aroused by the owner's complaint. From earlier visits the officers had learned that the apartment's inhabitants were unwilling to vacate and were likely to resist forcibly any efforts to persuade them to leave. Upon arriving at the apartment and knocking on the door on the morning of the 26th, they heard the sound of weapons being loaded and a heavy object being moved in front of the door. When the door was opened, the occupants, two of whom were Powell and Cooper, appeared to be very suspicious and during the ensuing conversation demonstrated a marked reluctance to leave for whatever reason. When the disguised officers were finally recognized to be policemen, the occupants immediately shouted "Pigs" and attempted to bar the door. Conduct such as this was not what could reasonably be expected from persons legitimately on the premises. To the contrary the armed hostility of the apartment's occupants, their unwillingness to offer any explanation for their presence, and their resistance to the inquiries of the police all indicated that there was substance to the Housing Authority's charges. At this point the arresting officers, as prudent men, had probable cause to believe that the persons living in Apartment A were trespassing. Failure to take decisive action would have only postponed the inevitable confrontation. Though somewhat unusual, their entrance into the apartment for the purpose of arresting its occupants was lawful. Upon entering the officers were presented with more than ample cause to arrest Morris and seize the illegal weapon which was in his actual possession. We hold that the district court properly denied his motion to suppress this evidence.

Morris' other contention is that the registration provisions of the National Firearms Act, as applied to him, violate his fifth amendment privilege against compulsory self-incrimination. A citation to the Supreme Court's decision in United States v. Freed [12], in which it was determined that the Act did not conflict with the fifth amendment, would ordinarily be sufficient to dispose of this issue. Since *Freed*, contentions similar to that made by Morris have been considered by this Court on numerous occasions and without exception have been rejected. [13]

Morris seeks to avoid the force of these decisions by casting his claim in a

1972) ; United States v. Wysocki, 457 F. 2d 1155 (5th Cir. 1972), and United States v. Squella-Avendano, 447 F.2d 575 (5th Cir. 1971).

12. 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971).

13. *See, e. g.*, United States v. Coleman, 441 F.2d 1132 (5th Cir. 1971). *Accord* United States v. Bowdach, 458 F.2d 951 (5th Cir. 1972), United States v. Mix, 446 F.2d 615 (5th Cir. 1971), United States v. Williams, 446 F.2d 486 (5th Cir. 1971), United States v. Beck, 443 F.2d 1360 (5th Cir. 1971), United States v. Piper, 443 F.2d 371 (5th Cir. 1971), United States v. Miller, 441 F.2d 1147 (5th Cir. 1971), and United States v. Johnson, 441 F.2d 1134 (5th Cir. 1971).

somewhat novel form. He does not make the usual argument that had he registered his firearm in compliance with the Act, he would have been required to reveal information that might in the future be acquired and used by state officials to prosecute him for possession of an illegal weapon, in this instance a machine gun. Instead appellant points to the regulations adopted under the Act which require a prospective transferee of a firearm to secure from local law enforcement officials a certificate verifying that the photograph and fingerprints furnished in the registration application are indeed his and that the weapon is intended for lawful purposes.[14] In order to comply with this requirement the prospective registrant of a machine gun obviously must admit to local officials that he is attempting to possess one. Since Louisiana prohibits the private possession of a machine gun [15] and reads the law of attempt broadly [16], Morris argues that in Louisiana the prospective, albeit ineffective, registrant of a machine gun is nevertheless forced to reveal information which might be used by the state to prosecute him for attempted possession.

 Although we entertain serious doubts as to whether Louisiana officials would actually prosecute an unsuccessful registrant of a machine gun for attempted possession of one [17], we need not consider this question because there is a simpler answer to appellant's argument. § 5848 of the Firearms Act provides in pertinent part:

> "No information or evidence obtained from an application . . . shall . . . be used, directly or indirectly, as evidence against that person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application . . ." [18]

This provision was written into the Act in order to eliminate any conflict with the fifth amendment and is to be construed accordingly.[19] It means that federal and state officials are barred from using in a prosecution for prior or concurrent offenses any information provided them in an effort to comply with the Act's registration provisions, regardless of whether the information is obtained from the application form itself or instead is revealed by the applicant in the process of filing an application.[20] Because of this statutory barrier to use, compliance would have left Morris in the same position as if he had never admitted his intention to possess a machine gun. It makes his fear of a state prosecution for attempted possession more imaginary than real. We conclude that Morris' indictment and conviction under the National Firearms Act did not violate his constitutional privilege against self-incrimination.

For the foregoing reasons the judgment of the district court is affirmed.

Affirmed.

---

14. 26 C.F.R. §§ 179.98–179.99.

15. LSA–R.S. 40:1752. Morris contends that under Louisiana law "machine gun" is defined so as to include the automatic rifle found in his possession.

16. LSA–R.S. 14:27.

17. In its brief at pg. 7 the government makes the uncontested assertion that there have been no prosecutions for attempted possession of a machine gun.

18. 26 U.S.C. § 5848 (Supp.1972).

19. *See* S.Rep. No. 1501, 90th Cong., 2d Sess., 26, 42, 48, 52; HR Cong.Rep. No. 1956, 90th Cong., 2d Sess., 35.

20. *See, e. g.,* United States v. Freed, 401 U.S. 601, 604, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) and United States v. Coleman, 441 F.2d 1132, 1133 (5th Cir. 1971).