**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Oscar Ramon ALEJANDRO and
Manuel Cervantes Rocha,
Defendants-Appellants.**

No. 75–1585.

United States Court of Appeals,
Fifth Circuit.

Feb. 19, 1976.

As Amended on Denial of Rehearing and
Rehearing En Banc April 7, 1976.

Joe L. Hernandez, San Antonio, Tex.
(Court appointed), for Rocha; Anthony
Nicholas, San Antonio, Tex. (Court appointed), for Alejandro; Terrence W.
McDonald, San Antonio, Tex., for defendants-appellants.

John E. Clark, U. S. Atty., Jeremiah Handy, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before BROWN, Chief Judge, RIVES and GEE, Circuit Judges.

RIVES, Circuit Judge:

Count 1 of the indictment charged one Fred Salazar Mauricio along with *Alejandro* and *Rocha* with conspiracy to possess and distribute heroin in violation of 21 U.S.C. § 846. Count 2 charged *Rocha* with unlawfully distributing 68.25 grams of heroin in violation of 21 U.S.C. § 841(a)(1). Count 3 charged *Mauricio* with the substantive crime of possessing with intent to distribute the heroin. (II R. 1.) Thus *Alejandro* was charged with *conspiracy* only, while each of the other two defendants was charged with both conspiracy and a related *substantive* crime. The jury found each defendant guilty as charged, and the court sentenced each to a term or successive terms of imprisonment. Mauricio did not appeal.[1]

On appeal, Alejandro urges three grounds for reversal: 1. No probable cause was proved for his arrest and subsequent search. In the absence of probable cause for the arrest, Alejandro contends that the fruits of his search were inadmissible. Those fruits included cash in excess of $2,100.00 and statements made by him after his arrest. 2. The district court erred in denying his motion under Rule 14 of F.R.Cr.P. for severance and prejudicial joinder with the co-defendant Mauricio. 3. The district court erred in denying his motion for judgment of acquittal.

On appeal, Rocha urges two grounds for reversal. 1. The district court erred in denying his separate motions for judgment of acquittal under Counts 1 and 2. 2. The district court erred in permitting over his objections, the Government to prove by its witness Albert Chevera, a policeman for the City of San Antonio, that in the summer of 1972, about two years prior to July 23, 1974, the date on which the crimes being tried were alleged to have been committed, he, Chevera, purchased heroin from Rocha, and that on June 25, 1973, Rocha was convicted of this sale of heroin in Bexar County, Texas "in one of the district courts" (II R. 162) and received a ten-year probated sentence (II R. 161).

As to Alejandro, and as to Rocha we affirm each of the judgments of conviction. A somewhat detailed statement of the evidence is needed for an understanding of the case. As part of its evidence of probable cause for the arrest of Alejandro, the Government proved that an individual who had not previously given information did, on July 23, 1974, communicate by telephone with one of the Special Agents of the United States Drug Enforcement Administration at San Antonio, Texas, to the effect that Jaramillo and Mauricio would arrive that morning at the San Antonio, Texas International Airport, in a 1962 Chevrolet automobile bearing a particular license plate; that the time of their arrival at the airport would be approximately 10:30 a. m.; and that they were to meet an individual, whose identity the informant did not know, but who was coming from Grand Rapids, Michigan, for the purpose of buying a quantity of heroin.[2]

Following the tip from their first-time informant, the Drug Enforcement Agents set up a surveillance under

---

1. The complaint before the magistrate included a fourth accused, Gene Jaramillo. The magistrate dismissed the complaint against Jaramillo because "[t]here is insufficient evidence of guilt." (II R. 207.)

2. Alejandro and his attorney signed a stipulation "that if W. J. Prokosh, station auditor, North Central Airlines, were called as a witness in the above entitled cause and duly sworn he would testify that the records of North Central Airlines show that a ticket for a flight from Grand Rapids, Michigan to Dallas, Texas, on July 22, 1974 was issued in the name of Mr. O. Alejandro on July 22, 1974 in Grand Rapids, Michigan and was paid for in the amount of $91.27." (II R. 39.)

Agent Seay's direction, of the San Antonio Airport. At about 10:40 a. m., July 23, 1974, the agents observed a man who later proved to be Alejandro standing inside the lobby in front of the main door of the airport terminal (II R. 59). They saw Alejandro, Jaramillo and Mauricio walk together from the terminal to the parking lot and enter a 1963 brown Chevrolet,[3] Alejandro carrying a blue suitcase with an airline baggage claim check attached.

Asked to give the route of the Chevrolet from the airport terminal to wherever it stopped, Agent McCullough testified to a circuitous route, stopping first at a Texaco service station, but not for the purchase of gasoline or other service; after staying about five minutes the car was driven to a "Franz Ice House" (II R. 60) and simply staying there about five minutes, then proceeding toward the downtown area, en route turning into a street only one block long and which then deadends, coming out of that street "in about a minute or two" and going on to Gordon's Jewelers where all three occupants got out of the car. Jaramillo and Mauricio entered the jewelry store. Alejandro stayed outside on the sidewalk. After a few minutes all three got back in the car and went to the "Red Baron Ice House". They went into the Ice House and were there for about ten minutes. Then all three got back in the car and sat there "for a short time." (II R. 61.) Then Alejandro and Jaramillo got out and went back to a table on the sidewalk of the Red Baron Ice House, while Mauricio drove the car about one city block, or by speedometer reading about two-tenths of a mile, south to "Buddy Civilettio's Supermarket" and parked there on the extreme north end of the supermarket.

"Q  Is this a great big parking lot?

"A  Well, it's an L-shaped parking lot with the most used portion of the parking lot on the south end where the only entrance to the Supermarket

is; whereas he was on the north end, he was really at the back of the store, if you count the front door as the south end.

"Q  His vehicle, was it pointed in the direction that ordinarily vehicles park there in that area as far as the lines of the parking lot themselves, the parking lanes?

"A  When he originally parked, it was. But after a few minutes, he turned it around and was facing Commercial with his back toward the Supermarket."

Mauricio stayed in and around the car for about ten minutes; Rocha entered the scene, driving a Ford pick-up which pulled alongside Mauricio's Chevrolet. "He was parallel, adjacent to Mauricio's Chevrolet, but pointing in the opposite direction." (II R. 64.)

"  .  .  .  Mauricio immediately got out of the Chevrolet, walked around behind his car and stood on the passenger side of the Ford pickup.

"Q  For what length of time did he remain there?

"A  Not more than thirty seconds. And then he went back around behind his car and got in the driver's side and left.

"Q  As best you can, describe his physical appearance and actions as he left the pickup and moved back to his car?

"A  The main thing that I noticed was that he was holding his right arm in an unusual manner. He was holding it stiffly beside his leg. That's about the best way I can describe it." (II R. 64, 65.)

The witness McCullough then observed Agent Seay: "He was right in front of where the two vehicles were parked on Commercial. He was going southbound on Commercial very slowly and he was right in front of where they were parked when Mr. Mauricio was going back into his car." (II R. 65.)

---

**3.** No point is made about the year model of the Chevrolet and the parties proceed as if the number of the license plate accorded with the information furnished the agents though we have not found that part of the testimony.

We turn to Agent Seay's testimony, beginning when Mauricio was parking at the supermarket.

"    .    .    .    He parked in the parking lot of the Supermarket away from all of the traffic and other cars that were parked there."

\*    \*    \*    \*    \*    \*

"I was watching back in the vicinity where Mauricio was parked there at the parking lot of Civilettio's Supermarket. I noticed that Mauricio was sitting in his car. And at one point he opened the door of the car and he hung his feet out, but he actually never got out of the car. He just hung his feet out of the car on to the pavement and sat in the front seat of the car.

"In a few minutes, he moved his car around where it was facing Commercial Street. He sat there for a few minutes. After he had been there I would say anywhere from six to eight minutes, a blueish-green pickup drove up, pulled right up beside his automobile and parked right next to him.

"Q All right. At this point in time, what if anything did Mr. Mauricio do?

"A After the pickup arrived, I started driving toward the Supermarket on Commercial. I was going north. At this point while I was driving I noticed that Mauricio got out of his car and walked around behind it towards the pickup. I was having trouble watching him real well at that point. But in a few minutes, I arrived just parallel to where the pickup and the car was parked side by side. I turned my head and I looked over and I noticed that Mauricio was walking back from the pickup around the back of his car. And as he came around the back of it, he was carrying a package in his right hand.

"Q Describe that package that you were able to observe.

"A The package appeared to be about the size of a baseball, maybe not quite that large. It was just a little bit smaller than a baseball, and it was very shiny and it was white colored. But it was shiny. He had it in his hand. He had his hand cuffed in this fashion.

"Q Where was his hand?

"A He was holding his hand down near his right leg, alongside his right leg. He was also walking in a semi-crouched position. He wasn't walking erect. He was walking more or less crouched.

"Q Who was the driver of the pickup?

"A The driver was Manuel Rocha.

"Q Any other occupants in the pickup?

"A No, sir.

"Q At that point in time after you observed this, what did Mr. Mauricio do? I think we have got him up to his car door in the position that you stated he was in. What did he do at that point? Did he remain outside his vehicle or what did he do?"

"A No. He got into the vehicle. And at this point I was trying to make a U-turn and I wasn't watching him any more. As soon as he got into his car, I tried to make a U-turn in the middle of the street there which was Commercial so that I could go back to where Manuel Rocha was at. And then I noticed by this time that Mauricio had gotten in his car and that he was pulling out on to Commercial heading north.

"Q Did you cause a radio transmission to be made at that time?" (II R. 105–108.)

Agent Seay transmitted an order by radio for arrests of the four first accused, Mauricio, Rocha, Alejandro and Jaramillo. Mauricio parked his car back at the Red Baron Ice House. Alejandro and Jaramillo got up from the table and were walking toward Mauricio's car. Agent McCullough first arrested Alejandro and Jaramillo. Police Officer Chevera arrested Mauricio (II R. 87). Rocha had moved his pickup to be facing the Red Baron Ice House before he was arrested.

Jaramillo and Alejandro obeyed Agent McCullough's order, i. e., "Federal Agents. You are under arrest. Put your hands up on the car and don't move." (II R. 86, 87). Agent McCullough couldn't cover them and search them at the same time so he waited for Chevara to come around with Mauricio before patting them down (II R. 87). He then found $2,131.92 in Alejandro's right front pant's pocket, (II R. 88, 95) which he quickly counted. Observing that the bills were not marked, he replaced the money in Alejandro's pocket. Thereafter all three, Mauricio, Jaramillo and Alejandro were advised of their constitutional rights (II R. 89) and were seated at the table at Red Baron Ice House. Alejandro then asked Agent McCullough, "Who told you about this?" (II R. 89.) McCullough testified that Alejandro spoke to him in English and then spoke to Officer Chevara in Spanish. Chevara testified that "He said, 'Quien te dijo? Alquien de aqui, o de alla?' He said, 'Who told you? Somebody from here or over there?'" (II R. 160.)

As to Mauricio's arrest immediately theretofor, Chevara testified:

" . . . Mauricio I guess hadn't seen me, so I went around and told him I was a policeman and he was under arrest.

"Q  Where was he?

"A  He was sitting inside of his car.

"Q  What was he doing inside of his car?

"A  He was sorting out little plastic packages later found to contain heroin.

"Q  Did you take that into your custody?

"A  Yes, sir."[4]  (II R. 154.)

No new evidence was revealed or statements made in the post-arrest search and seizure of Jaramillo and Rocha.

Our lengthy statement of the pertinent evidence may help us make comparatively brief statements of the court's conclusions.

### I.  Probable Cause.

█ The information furnished by the first-time informer was enough to authorize, if not indeed to require, the Drug Enforcement Agents to conduct the surveillance which resulted in the arrests of the four accused men. The accuracy of a large part of that information had been corroborated by the agents themselves in their observation of the meeting at the airport terminal between the persons named by the informant, Jaramillo and Mauricio, and Alejandro; the devious path of the car toward the Red Baron Ice House; Mauricio's short additional drive to a clandestine meeting with Rocha. With all of that corroboration added to the hearsay information furnished by the first-time informer, we conclude and hold probable cause existed for the arrest of Alejandro, Mauricio and Jaramillo. There was no time to get a search warrant, and Agent Seay in charge of the surveillance, with his experience as a Drug Enforcement Agent, properly gave the order for their arrests. *Brinegar v. U. S.*, 1949, 338 U.S. 160, 175, 176, 69 S.Ct. 1302, 93 L.Ed. 1879; *U. S. v. Morris*, 5th Cir., 1973, 477 F.2d 657, 663.

### II.  Denial of Severance to Alejandro.

█ The district court did not abuse its discretion in denying Alejandro's motion for severance from Mauricio. See Rule 14, F.R.Crim.P.

It is true that Mauricio attempted, against the advice of his appointed counsel to plead guilty, but refused to involve Alejandro, Rocha or any other person in

---

**4.** The government chemist testified that the total amount of powder in the plastic packages was 68.25 grams, 5.0 percent of which was pure heroin (II R. 189); that 5.0 percent is a common dosage or range of heroin in powder; lactose and procaine are used to "cut" the heroin (II R. 189). Agent McCullough testified (II R. 97) that on the illegal market in San Antonio on July 23, 1974, heroin was sold at from $700 to $750 per ounce or at from $35 to $45 per gram.

the conspiracy, or in the substantive crime, to verify the facts upon which Government counsel stated he would rely for proof of the conspiracy or for proof of the substantive crime. The district court then declined to accept Mauricio's tendered plea of guilty and entered for him a plea of not guilty both as to the conspiracy and as to the substantive crime.

In the course of the trial, Mauricio was called as a witness for Alejandro. Mauricio's appointed counsel objected and urged his client to take the protection of the Fifth Amendment. The court also advised Mauricio and he responded as follows: "I will take the Fifth Amendment." (II R. 202.)

Alejandro's main reliance for severance on this ground rests on a Seventh Circuit decision, *U. S. v. Echeles,* 1965, 352 F.2d 892, which does present a closely analogous situation. The *Echeles* case recognized that "[w]hat constitutes abuse of discretion in terms of safeguarding each defendant's rights in such cases necessarily depends upon the facts in each particular case." 352 F.2d at 897 (citations omitted). The *Echeles* case was different from the present case in many ways, only one of which need be noted. In the *Echeles* case the court said:

> "Moreover, it would in fact seem more likely than not that Arrington would have testified for Echeles for the reason that three times previously, in open court, Arrington had voluntarily exculpated Echeles, apparently contrary to his own penal interest."

352 F.2d at 898. In the present case it is not apparent that Mauricio ever offered to exculpate Alejandro *"contrary to his own penal interest."* Mauricio had been caught red handed with the heroin in his possession and had no apparent course open better than to admit his own guilt. His effort to absolve his co-defendant cost him nothing. It is not unusual under such circumstances for the obviously guilty defendant to try to assume the entire guilt. Denying Alejandro the opportunity to get that kind of testimony from Mauricio was not, in our opinion, depriving Alejandro of a fundamentally fair trial. If a severance had been granted and thereafter, as a result of Mauricio's trial or otherwise, it had appeared to Mauricio's interest not to testify for Alejandro, the probability is that he would again have refused to testify. Under the circumstances of the present case we hold that the district judge did not abuse his discretion in denying Alejandro's motion for severance.

### III. Denial of Alejandro's Motion for Judgment of Acquittal.

█ Taking the view most favorable to the Government as we must under the oft-quoted test,[5] there was ample evidence to support the jury's verdict finding Alejandro guilty of conspiracy, for example: (1) his plane trip from Grand Rapids, Michigan, to San Antonio; (2) his meeting with Mauricio and Jaramillo at the San Antonio International Airport terminal; (3) their devious trip to the Red Baron Ice House; (4) his waiting there for Mauricio to return from his meeting with Rocha; (5) his stepping toward the car when Mauricio returned from that meeting; (6) his having more than $2100, enough to pay for the heroin, in his right front pocket; and (7) his questions first in English to Agent McCullough, "Who told you about this?", and then in Spanish to Officer Chevera, "Who told you? Somebody from here or over there?"

### IV. Denial of Rocha's Motion for Judgment of Acquittal.

Again taking the view most favorable to the Government there was substantial evidence to support the jury's verdict finding Rocha guilty both of conspiracy and of the substantive offense. True, Rocha and Mauricio met for only about thirty seconds, but the evidence was strongly to the effect that when Mauricio approached Rocha he had nothing in his hand and when he left Rocha he was

---

5. *Glasser v. U. S.,* 1941, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

trying to conceal the foil-wrapped package of heroin, and upon his return to the Red Baron Ice House, Mauricio had the package and the heroin, while Ford was awaiting nearby, apparently for some or all of the money carried by Alejandro in his right front pants pocket in payment for the heroin.

V. The Denial of Rocha's Objections to the Admission of Chevera's Testimony of a Previous Sale by Rocha for which He Was Convicted and Placed on Probation.

■ At the time of the admission of this evidence against Rocha the district court gave the following instruction to the jury:

"The evidence which has been received and admitted by the Court with reference to Rocha is not to be considered by the Jury as any evidence against either of the other Defendants, that is, Mr. Mauricio or Mr. Alejandro. And any evidence of a prior crime or activity which has been committed or a similar activity by a given Defendant, in this case, by Mr. Rocha alone, is admissible only to show that state of mind, intent, knowledge or lack of innocent purpose on the part of that Defendant and for no other purpose. And you cannot for any purpose whatsoever consider this as any evidence whatsoever of specific intent, guilt or any other purpose against the other two Defendants, Alejandro and Mauricio." (II R. 161, 162.)

The Government, of course, concedes the general rule that evidence of another crime extraneous to the indictment is inadmissible at trial. It insists that the evidence comes within one or more of the many exceptions to that general rule.[6] Specifically the Government says "that the first heroin transaction is admissible on the issue of intent, scheme and pattern of conduct" (Gov. Brief p. 13).

Considering the substantive offense entirely separate from the conspiracy, a strong case is presented that, if Rocha did the physical act charged, if he delivered the heroin to Mauricio, there can be little doubt that he did so with the requisite willfulness and intent, that "[p]roof of the commission of the act carried with it the evident implication of a criminal intent." *Fallen v. U. S.,* 5th Cir. 1955, 220 F.2d 946, 948.[7] If we apply the "balancing test"[8] it may be that the probative value of the evidence to show that Rocha did deliver the heroin to Mauricio outweighed its probative value to show intent or knowledge.

The probative value of the evidence was needed especially to show how Rocha fit into the conspiracy, that is as a known seller of heroin, then on probation. The evidence may have been admissible against Mauricio and Alejandro for that purpose, though there was already ample evidence against those two. On the other hand as against Rocha, the evidence of guilt of conspiracy was not so strong, and evidence of the earlier sale and conviction tended to show that he not only fitted into the conspiracy plan but that he had the requisite intent to become a party to the conspiracy. The conspiracy and the substantive offense were so interlocked and inseparable that proof of the one tended to prove the other. We conclude that the district court did not abuse its discretion in denying Rocha's objections to the admissibility of this evidence.

The judgments of conviction of both Alejandro and Rocha are

Affirmed.

---

6. *See* Wright, Federal Practice & Procedure, Criminal § 410; *compare* Rule 404(b) Federal Rules of Evidence (1975), not applicable at time of trial; *see also* McCormick, Evidence 447–454 (2d ed. 1974); 2 Wigmore on Evidence § 302 (3d ed. 1940).

7. *See also U. S. v. Goodwin,* 5th Cir. 1974, 492 F.2d 1141.

8. *See U. S. v. Simmons,* 5th Cir. 1974, 503 F.2d 831, 834.