# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT
-----------------
**94-60811**
-----------------


**UNITED STATES OF AMERICA,**

                         **Plaintiff-Appellee,**


    **versus**


**NOEMI DUARTE FREEMAN,**

                         **Defendant-Appellant.**


-----------------------
**Appeal from the United States District Court for the
Southern District of Texas**
-----------------------

**February 29, 1996**

**Before POLITZ, Chief Judge, HILL\* and DeMOSS, Circuit Judges.**


------------
**\* Circuit Judge for the Eleventh Circuit, sitting by designation.**

**HILL, Senior Circuit Judge:**

      Noemi Freeman was convicted of violating 18 U.S.C. § 371 by conspiring

to illegally import Amazon parrots from Mexico to the United States of America;

18 U.S.C. § 545 by receiving the parrots; and 16 U.S.C. § 1538(c)(1) by possessing the parrots. We are asked to review the sufficiency of the evidence supporting Freeman's convictions, and to review the district court's denial of her motion for a new trial based upon newly discovered evidence. For the following reasons, we affirm her convictions and sentence.

## I. Background

Noemi Freeman owns and operates a large aviary in Burleson, Texas. On many occasions, between 1990 and 1993, she purchased baby yellow-naped Amazon parrots from Jesus Maldonado and his common-law wife Irene Vasquez who run an aviary in Sandia, Texas. For many years, Maldonado and Vasquez used the aviary to conceal the fact that they were smuggling Amazon parrots from Mexico and Central America into the United States.[1]

Maldonado's main source for the birds was Salvador Salazar,[2] who resided in Mexico. Maldonado's cousin, Teodoro Garcia, drove for Maldonado on "hundreds" of his deliveries of smuggled birds. Shortly before February 7, 1992, Maldonado and Salazar smuggled some one hundred Amazon parrots into the United States.

---

[1] The parrots involved in this case are protected by treaty and may be imported only with a permit from the country of origin. Additionally, they must be quarantined to protect against importation of the deadly and highly contagious Exotic Newcastle Disease.

[2] Salazar also uses his mother's maiden name, Cazares, as is the Latin custom.

2

On February 7, 1992, Maldonado and Garcia were stopped in Austin for a traffic violation. The police found and seized seventy baby yellow-naped parrots in the vehicle. Some time later, Maldonado and Garcia were arrested and charged in the Western District of Texas with smuggling birds. After Maldonado refused to employ a lawyer for Garcia, Garcia pled guilty to a misdemeanor and began to cooperate with the government. Garcia testified against Maldonado at his trial, and Maldonado was convicted.

Additional investigation by the Customs Service, including a search of Freeman's residence on August 26, 1993, along with information provided by Garcia, revealed a multi-year conspiracy between Maldonado and a dozen other individuals, including Freeman and her common-law husband, Anderson, to smuggle and distribute hundreds of Amazon parrots from Mexico and Central America. On April 14, 1994, the grand jury for the Southern District of Texas indicted Maldonado, his wife Vasquez, Freeman and Anderson,[3] and ten other persons on conspiracy charges and related substantive offenses. That is the case before us.

The indictment alleges that Freeman participated in the conspiracy to illegally import Amazon parrots over a period of time (Count 1), and that she received and possessed illegally imported Amazon parrots (Counts 8 and 9).

---

[3] On the third day of trial, Anderson's counsel suffered a heart attack. Anderson moved for a mistrial which was granted. Freeman continued on alone.

Maldonado, Vasquez, and five other defendants pled guilty to some or all of the charges against them. At Freeman's trial, the following evidence was admitted.

Garcia testified that he and Maldonado delivered Amazon parrots to Freeman on numerous occasions. He related a conversation he heard on one delivery when Maldonado told Freeman that the birds were tired because "they had come a long way." When they were stopped on February 7, 1992, Maldonado told the police that he and Garcia were going to Dallas/Ft. Worth. Freeman resides in Burleson, a Dallas suburb. Garcia testified that the parrots seized on February 7, 1992, were intended for delivery to Freeman.

Garcia testified that when he and Maldonado were released by the police later that day, Maldonado went directly across the street to a pay phone and called his wife. According to Garcia, Maldonado told Vasquez to get another shipment ready to fill the Freeman order for baby Amazon parrots. Maldonado also spoke from the pay phone with Salazar and requested that Salazar send more parrots. Although Maldonado denied he made the calls, Salazar's testimony corroborated Garcia's.

Garcia further testified that, on the drive back to Sandia, Maldonado asked Garcia to drive the car on the re-delivery of the parrots to Freeman. Garcia declined. Some time later, Maldonado told Garcia that he (Maldonado) had completed the delivery to Freeman two or three days after February 7.

Telephone records reveal numerous phone calls between the Maldonado and Freeman residences, including two hours of phone calls on February 7 and 8.[4] On March 1, immediately after government agents conducted a search of Maldonado's aviary, there were seven minutes of collect calls placed from the pay phone nearest Maldonado's residence to the Freeman residence. On or about the next day, Freeman received a fax from Vasquez containing the search warrant executed upon the Maldonado residence and the probable cause affidavit for the search. This affidavit outlined the evidence of smuggling which supported the warrant, *i.e.,* the February 7 seizure of baby parrots which Garcia testified were intended for Freeman. Freeman testified she requested the fax of the warrant because she was merely "curious" about the search.

On June 17, 1992, Freeman received another fax from Vasquez in which Vasquez told Freeman:

> I think he'll [Jesse] be okay if he can get his day in court. I don't know what happened that scared you so. We don't blame you but we want you to know we won't implicate you in anything. The only reason we talked, you were teaching me about incubation. Maybe someday when the whole thing blows over we can do some business, but don't worry, Jesse will never say anything about anyone.

Both of these faxes were found in Freeman's residence during the August 26, 1993, search, more than a year after she received them.

Bank records reveal checks dated from 1990 to 1993, made out by Freeman to Maldonado, or made out to "cash" with references to Maldonado for

---

[4] Despite these calls, Freeman's testimony was that she did not learn of Maldonado's arrest until February 9.

approximately $97,000. Additional checks, made out to cash by Freeman between 1990 and 1993, without an explicit reference to Maldonado, totalled about $250,000.

Although the government searched Freeman's office for five to six hours when they executed the search warrant at Freeman's residence without finding any invoices for these checks, Freeman produced at trial what she claimed were invoices covering many of the checks. She testified she had found them in her desk drawer (which Customs agents had searched) and that they represented transactions for which cash was needed. However, further examination revealed that the "invoices" reflected transactions that had to have occurred before the dates the checks were stamped by the bank as actually cashed. Thus, the cash represented by those checks could not have been used for those supposedly invoiced cash transactions.

According to expert testimony, the deliveries of smuggled birds were made in an unprofessional manner, with the birds crowded together. Often the birds were sick with Exotic Newcastle Disease found predominantly in birds from the wild.[5] The disease is not present in domestic birds. The smuggled baby parrots were always delivered in the breeding and hatching season of birds in the wild. They were delivered at odd times of the day.

---

[5] Amazon parrots imported legally are quarantined to insure they are free of the disease prior to sale. The government introduced into evidence a letter from Freeman to Maldonado regarding his delivery of sick parrots.

Maldonado testified that Freeman continued to purchase baby parrots from him after February 7 (although not the specific parrots at issue in Counts 8 and 9). Freeman testified she purchased only adult birds from him after that date.

The jury convicted Freeman of conspiring to illegally import Amazon parrots into the United States (Count 1), and also of knowingly receiving and possessing illegally imported Amazon parrots (Counts 8 and 9). The district judge denied Freeman's motions for a judgment of acquittal ruling that there was sufficient evidence to send the case to the jury, and that the jury convicted her. He sentenced Freeman to twenty-seven months in prison.

We review the sufficiency of the evidence *de novo*. *United States v. Thomas*, 994 F.2d 173 (5th Cir. 1993). We review for an abuse of discretion the district court's denial of the motion for a new trial. *United States v. Simmons*, 714 F.2d 29, 31 (5th Cir. 1983).

## II. Analysis

A. <u>The Sufficiency of the Evidence</u>

Freeman admitted that she bought baby yellow-naped parrots from Maldonado on several occasions over the years. Maldonado admitted that the parrots were smuggled. The checks confirm a long-standing business relationship between them.

Freeman is guilty of the conspiracy charge, therefore, if she *knew* the birds were smuggled. The evidence of her guilty knowledge includes the manner and timing of the delivery of the birds. The expert testimony was that the manner of

7

these deliveries was not in the normal course of business. The babies were always delivered during the hatching season of yellow-napes in the wild. We may infer from this evidence that a knowledgeable purchaser should have been suspicious.

Additionally, many of the birds were sick with a disease that is not found in domestically-bred birds. The testimony was that Freeman was an experienced bird breeder and dealer, who would have known all of this and who was well-aware that many yellow-napes sold in this country are smuggled. Finally, Maldonado testified that Freeman continued to purchase "baby" yellow-napes <u>after</u> the seizure of the birds on February 7, when Freeman had actual knowledge that Maldonado had been charged with smuggling baby yellow-napes.

This evidence is sufficient to support the jury's determination that Freeman was involved in a conspiracy to smuggle birds.

As to counts 8 and 9, the issue is whether Freeman actually received and possessed smuggled parrots. The evidence against Freeman included Maldonado's testimony that he and Garcia were headed to Dallas/Ft. Worth when they were stopped by the police, and Freeman's testimony that she lives in the Dallas suburb of Burleson. Although Maldonado testified that the birds were intended for another purchaser, Suzie Coots, the jury was free to reject this testimony in view of Vasquez's fax to Freeman in which she told her friend not to worry about Maldonado's arrest and promised her that he would not say anything to "implicate" Freeman.

8

In addition, the jury could consider the two hours of telephone calls on February 7 and 8, Freeman's request for the search warrant and affidavit discussing the February 7 seizure of parrots, and the various checks recording her transactions with Maldonado.

The most critical testimony, however, was undoubtedly Garcia's[6] that Maldonado told him that he had completed the delivery of parrots to Freeman. If credited by the jury, this testimony alone would be sufficient upon which to convict her on Counts 8 and 9. *United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir. 1991) (conviction may be based on uncorroborated testimony of someone making a plea bargain with the government).

Freeman argues that Garcia's testimony is so incredible that this court should declare it so as a matter of law and overturn the jury's credibility determination. Although the jury is ordinarily the final arbiter of the credibility of witnesses, *United States v. Restrepo*, 994 F.2d 173, 182 (5th Cir. 1993), testimony can be declared incredible as a matter of law if it asserts facts that the witness physically could not have observed or events that could not have occurred under the laws of nature. *United States v. Alaniz-Alaniz*, 38 F.3d 788, 791 (5th Cir. 1994). Freeman claims that Garcia's testimony was that Maldonado delivered the parrots to Freeman the <u>same night</u> they were detained in Austin and that such a delivery defies physical laws.

---

[6] Admitted over objection as a co-conspirator's statement in furtherance of the conspiracy. The admission of this statement is not alleged as error.

9

But this was not Garcia's testimony. Garcia's testimony was that Maldonado told him two or three days later that the delivery to Freeman had been accomplished. Maldonado did not say <u>when</u>. The government concedes that in other testimony, <u>not before the jury</u>, Garcia did appear to be saying that the delivery was made the same night they were stopped in Austin, but points out that the jury did not hear this statement. Additionally, defense counsel did not use this available previous statement to impeach Garcia.

Garcia's testimony to the jury was that Maldonado told him the birds were delivered sometime in the next few days after February 7. Any statement to the contrary was not before the jury. Freeman's argument amounts to no more than second thoughts about what may have been a missed opportunity to impeach the witness.

The evidence as to counts 8 and 9 is sufficient to sustain the jury's determination that Freeman committed those offenses.

B.    <u>The Motion for a New Trial</u>

The Fifth Circuit applies the "Berry" rule to motions for new trial based on newly discovered evidence. *United States v. Pena*, 949 F.2d 751, 758 (5th Cir. 1991), *quoting Berry v. Georgia*, 10 Ga. 511 (1851). That rule requires a defendant, moving for a new trial based on newly discovered evidence, to show that:

> 1. the evidence is newly discovered and was unknown to the defendant at the time of the trial;

**2.** the defendant's failure to detect the evidence was not due to a lack of diligence;

**3.** the evidence is material, not merely cumulative or impeaching; and

**4.** the evidence would probably produce acquittal at a new trial.

*Pena*, 949 F.2d at 758. If the defendant fails to demonstrate any one of these four factors, the motion for new trial must be denied. Motions for a new trial based on newly discovered evidence are "disfavored by the courts and therefore are viewed with great caution." *Id., quoting United States v. Fowler*, 735 F.2d 823, 830 (5th Cir. 1984). Denial of a motion for a new trial based on newly discovered evidence is reversed only when there is a clear abuse of discretion. *Simmons*, 714 F.2d at 31.

The newly discovered evidence offered by Freeman is:

**1.** the testimony of Irene Vasquez, a convicted co-defendant, the wife of Maldonado and a personal friend of Freeman's;[7] and

**2.** the telephone toll records of Suzie Coots, another person who has been linked to Maldonado's parrot smuggling conspiracy.

**1.** <u>The Vasquez Testimony</u>

Irene Vasquez initially refused to testify at Freeman's trial, invoking her Fifth Amendment privilege. After Vasquez's sentencing, and Freeman's conviction, Vasquez testified at Freeman's hearing on her motion for a new trial. Vasquez testified that on February 6, 1992, Maldonado said to Garcia, in Vasquez's presence, that he intended to deliver smuggled parrots to Suzie Coots

---

[7] Freeman has given Vasquez over $3000 since her arrest to help pay her legal expenses.

1 1

the next day in Waco. Vasquez also testified that Coots called her three times on February 7, 1992,[8] and told her that she, Coots, was waiting in Hillsboro for Maldonado, but that he had not shown up.

First, this evidence is best characterized as "newly available" not "newly discovered." Freeman knew of this testimony during her trial. When a defendant is aware of a co-defendant's proposed testimony prior to trial, it cannot be deemed newly discovered under Rule 33 even if the co-defendant was unavailable because she invoked the Fifth Amendment. *United States v. Metz*, 652 F.2d 478 (5th Cir. 1981).

Furthermore, the two women were personal friends who spoke on a regular basis, and who had common interests as co-defendants. As noted above, Freeman gave Vasquez $3000 for her defense fund. The district judge ruled that this evidence was not newly discovered, and we do not disagree.

The district court also held that, in any event, the evidence would probably not have produced an acquittal because it was merely cumulative. Maldonado had already testified at the trial that he intended to deliver the parrots to Coots. Vasquez's testimony, therefore, was not the only--or even the best--evidence of this theory of defense. Merely cumulative testimony does not justify a new trial. *United States v. Casel*, 995 F.2d 1299, 1307 (5th Cir. 1993), *cert. denied,* 114 S.Ct. 1308 (1994). Furthermore, the district court held that even if Maldonado were

---

[8] Vasquez's original declaration stated that Coots had called her only once on February 7. This statement changed after Vasquez reviewed Coots' telephone records.

delivering some parrots to Coots, he could still have been delivering the rest to Freeman.

Also, it was appropriate for the district court to take into account that Vasquez had nothing to lose by her testimony. *See United States v. Alejandro*, 527 F.2d 423, 428 (5th Cir. 1976), *cert. denied*, 429 U.S. 844 (1976) (noting that it is not unusual for the obviously guilty defendant to try to assume the entire guilt). The district court noted that Vasquez's testimony could be impeached. Even Freeman's counsel admits that her testimony could be impeached to "some extent." Not only is Vasquez a personal friend of Freeman's, but she is a convicted former co-defendant whose testimony would merely attempt to corroborate her common-law husband's testimony. Vasquez's newly proffered testimony also contradicts her earlier statements that Coots had called her only once that day and from Waco.[9]

In view of the overwhelming circumstantial evidence and the questionable credibility of Vasquez's testimony, the district judge held that even if the evidence were newly discovered, a new trial would probably not result in Freeman's acquittal. This holding is not a clear abuse of discretion.

2.     The Telephone Records

Freeman also offers Coots' phone records as newly discovered evidence which, taken in conjunction with Vasquez's testimony, would probably result in

---

[9] **Maldonado testified at trial that he was meeting Coots in Waco to deliver the parrots.**

13

acquittal in a new trial. Freeman contends the "newly discovered" phone records support her defense to Counts 8 and 9 that the smuggled parrots were intended for, and ultimately delivered to, Coots. The telephone records show six calls to the Maldonado residence on February 7, including three from Hillsboro, Texas that were made on Coots' ATT card. The district judge found that, even if the records were newly discovered evidence, they did not justify a new trial as they would likely not have produced a different result. This holding is not an abuse of discretion.[10]

First, telephone records introduced at trial showed one nine-minute call from the Maldonado residence to Coots' residence on February 7. This supplied some corroboration for Maldonado's testimony that the birds were intended for Coots. The jury apparently did not believe Maldonado the first time, and additional telephone records reflecting more calls that day are unlikely to change that assessment.

Second, the telephone records show that Coots apparently made only one phone call to the Maldonado residence on February 8, lasting six minutes, and made no further calls until March 23, 1992, making her an unlikely recipient of a redelivery between February 8 and 24, 1992.

---

[10] We have considered and rejected Freeman's claims that the district court applied a more stringent legal standard in assessing the importance of the phone records and made erroneous findings of fact in their regard. Also it should be noted that even if accepted, this evidence would not undermine Freeman's conviction on the conspiracy count as there was sufficient independent evidence other that offered on Counts 8 and 9 to convict Freeman of the conspiracy.

Moreover, the telephone records actually undermine the trial testimony of Maldonado. Maldonado testified that on February 7 he was attempting to deliver seventy smuggled parrots to Coots, who lived in Oklahoma City, but was meeting him in Waco to pick up the birds. Coots' phone records, however, show <u>three</u> calls on February 7 from a phone other than her residence. These calls were place from Hillsboro, Texas, <u>not</u> from Waco.

Furthermore, nothing in Coots' telephone records contradicts the evidence upon which the jury relied in convicting Freeman: Garcia's testimony that Maldonado intended to and did deliver the parrots to Freeman; Maldonado's testimony that Freeman continued to purchase baby parrots from him after February 7, 1992, when she knew he was smuggling parrots; telephone records that establish two hours of phone calls between the Maldonado and Freeman residences on February 7 and 8; and Maldonado's statement upon being stopped on February 7 that he was driving to Dallas/Ft.Worth (of which Burleson is a suburb), not Waco <u>or</u> Hillsboro.

Finally, even if the telephone records provide some support for Freeman's contention that the birds were to go to Coots, we agree with the district court that a delivery to Coots in Hillsboro would not have ruled out the delivery of birds to Freeman in Burleson.

Under these circumstances, there was no abuse of discretion in the district judge's ruling that the telephone records would not likely result in acquittal.

## CONCLUSION

15

As we find there was sufficient evidence to support Freeman's convictions and that there was no abuse of discretion in the denial of her motions for a new trial, the convictions and sentence are

AFFIRMED.