UNITED STATES of America, Appellee,

v.

Armando ZEULI, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Frank TERRANOVA, Defendant, Appellant.

Nos. 83-1299, 83-1348.

United States Court of Appeals, First Circuit.

Argued Nov. 7, 1983.

Decided Jan. 19, 1984.

Morris M. Goldings, Boston, Mass., with whom Richard S. Jacobs, and Mahoney, Hawkes & Goldings, Boston, Mass., were on brief, for Armando Zeuli.

William J. Kittredge, Hudson, Mass., with whom Kittredge & Giannetti, Hudson, Mass., was on brief, for Frank Terranova.

Robert J. Cordy, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, ROSENN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

ROSENN, Senior Circuit Judge.

In these consolidated appeals we are asked to review the convictions of a Massachusetts public official and a general contractor who have each been found guilty of conspiracy to extort and attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951,[1] after having been tried to a jury. Because we see no merit in either of the defendants' contentions, we affirm.

I.

In 1979, Arista Windows, Inc., a New York corporation, engaged in the manufacture and installation of aluminum windows. William Sceviour, vice president and outside superintendent of the company, had charge of Arista's contracts with the Brookline (Massachusetts) Housing Authority and the Fall River (Massachusetts) Housing Authority. In the late fall of 1979, Robert Olshever, a salesman-consultant for Arista, informed Sceviour that window work was available at the Watertown (Massachusetts) Housing Authority. The Doral Construction Company (Doral) of Woburn, Massachusetts had been awarded the general contract on the project. Accordingly, Sceviour and

---

* Of the Third Circuit, sitting by designation.

1. The relevant provisions of the Hobbs Act are: (a) Whoever in any way or degree obstructs, delays, or affects commerce ... by ... extortion or attempts or conspires so to do ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—
* * * * * *
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by ... fear, or under color of official right.

Olshever took a trip to Watertown to view the site.

Driving through the project, Olshever spotted Armando Zeuli, the owner of Doral. Olshever introduced Zeuli to Sceviour. Conversation ensued, and Zeuli eventually informed Sceviour that in order for Arista to capture the subcontract (a) Arista's contract price must be artificially inflated by $25,000 and that amount kicked back to Zeuli in cash; and (b) Arista must pay $5,000 to Frank Terranova, the Massachusetts Department of Community Affairs field representative on the Watertown project. Sceviour made no promises, but proceeded with Olshever to Zeuli's office.

Once there, Sceviour informed Zeuli that Arista would do the job for $175,000. Zeuli replied that if Arista agreed to inflate the contract in the amount of $25,000 and kick that amount back to Zeuli the parties would have a deal. Zeuli then added another term to the blossoming arrangement: Arista would have to perform some window and door work on a house Zeuli was building for his daughter. Sceviour agreed. The parties entered into a contract on November 21, 1979.

By mid-January 1980, most of the 1300 windows required had been manufactured and delivered to the Watertown site. In February, therefore, Sceviour asked Zeuli for the partial payment due under the subcontract. Zeuli replied that Arista would be paid when the Watertown Housing Authority paid Doral, and reminded Sceviour that Arista's payment would be inflated by the $25,000 kickback sum.

Several weeks later, Frank Terranova called Sceviour seeking a meeting in a Newton, Massachusetts motel restaurant. Sceviour agreed, and the two met. Terranova inquired, "What about my money?" A shaken Sceviour made no oral response but scrawled on a nearby napkin, "As soon as Arista gets its check, you'll get yours." Sceviour then burned the napkin in an ashtray. An amused Terranova then asked, "How much money are you going to give me?", to which Sceviour scrawled, "$5,000, all from Arista," before again putting a flame to the napkin. "Okay," said Terranova. This repulsive rendezvous then broke up.

On February 29, 1980, the Watertown Housing Authority issued a $152,832 check to Doral on account of their contract. Four days later, Sceviour and Arista President Peter Savino went to Doral's offices to pick up Arista's check. Much to their dismay, the check was made out for only $121,600, approximately $20,000 less than anticipated. Zeuli informed them that this turn of events was due to Doral's reduced payment from the Housing Authority. Sceviour responded by letting Zeuli know that he would receive only $10,000 of the kickback money until the remainder due Arista was forthcoming. The following Monday Sceviour handed Zeuli $10,000 in one hundred dollar bills, and the parties repeated their discussion of the remaining kickback money. In response to an inquiry by Zeuli, Sceviour added that the reduced payment to Arista made it impossible for it to pay Terranova. Zeuli volunteered to advance Terranova $2,000 of the $5,000 Arista had agreed to pay Terranova.

Throughout the spring and summer, Sceviour periodically returned to the job site, and Zeuli repeatedly pressed him for the money he had advanced to Terranova. On November 26, Sceviour—by now an undercover government agent tape-recording his conversations with the defendants—met Zeuli and Terranova at Watertown and took a walk with Terranova, informing him that he had $2,500 for him. Sceviour gave the $2,500 to Terranova, who agreed that a balance of $500 remained. Zeuli again pressed Sceviour for the $2,000 he had given Terranova.

On December 2, Sceviour met Terranova and informed him that he had the outstanding $500. He paid it to Terranova, and informed Zeuli that the $2,000 owed him would be forthcoming if Zeuli gave Arista a check that week. On December 5, Doral issued a $10,000 check to Arista, but stopped payment on it. On December 11, Sceviour met Zeuli and informed him that he had brought $1,000 in cash, which he

handed to Zeuli in Zeuli's car. The parties agreed that $1,000 was still due Zeuli. Zeuli never lifted the "stop payment" order, however, and Doral's $10,000 check to Arista would not be honored. Nevertheless, on December 23, Zeuli inquired about the outstanding $1,000. Sceviour replied that Zeuli must first come across with the $10,000. Accordingly, Zeuli gave Sceviour another $10,000 check. He also stated that Terranova could "walk away with six, seven big ones. Five, two, seven . . . ." Sceviour had no idea what Zeuli was talking about and inquired, "After one job?", to which Zeuli retorted, "Well it's one because he's at Lowell and . . . ." The meeting ended with the parties agreeing to get together a week later for the final payment.

On December 30, Sceviour made the final payment, observing that he was therefore "free and clear . . . no more obligations . . . to you and I got no more obligations to Terranova." Zeuli agreed, remarking that "Terranova made out better than both of us," and adding, "I'm giving him two up in Lowell." Zeuli then recapitulated the highlights of the Watertown arrangement, in the course of which he revealed that Terranova had approved a $17,000 change order for Doral at Lowell, which was twice as much as the work was worth.

On July 22, 1982, Zeuli and Terranova were indicted by a federal grand jury in the United States District Court for the District of Massachusetts on one count of conspiracy to extort and one count of attempted extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951. Following a six day trial, on March 14, 1983, the jury returned guilty verdicts against each defendant on both counts. Each appeals.

## II.

### A.

Defendants first contend that the district court erred in admitting into evidence Zeuli's remarks to Sceviour about the Lowell project. We disagree.

Evidence that a defendant on trial for one crime has been involved in some other crime or bad act has traditionally been held inadmissible if the evidence is introduced solely to prove that the defendant has the propensity to commit crimes of the sort for which he is on trial. Fed.R.Evid. 404(b) codifies this long-standing principle:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The most striking aspect of the rule is its inclusive rather than exclusionary nature: should the evidence prove relevant in any other way it is admissible, subject only to the rarely invoked limitations of Rule 403. *United States v. Fosher,* 568 F.2d 207, 212 (1st Cir.1978). Moreover, the test of admissibility is committed primarily to the trial court. *United States v. Eatherton,* 519 F.2d 603, 611 (1st Cir.1975).

We agree with the Government that the "intent" exception to Rule 404(b) justifies the trial court's decision to admit the evidence in this case. In a conspiracy case, each party's intent to conspire must be proven beyond a reasonable doubt. Thus, as the Fifth Circuit stated in *United States v. Roberts,* 619 F.2d 379, 383 (1980),

> In every conspiracy case, therefore, a not guilty plea renders the defendant's intent a material issue and imposes a difficult burden on the government. Evidence of such extrinsic offenses as may be probative of a defendant's state of mind is admissible unless he "affirmatively take[s] the issue of intent out of the case." [Citation omitted.]

Whatever else may be said about the Lowell evidence, the jury could surely have found it probative of each party's intent to conspire with the other at Watertown.[2]

2. Given our conclusion regarding the "intent" exception to Rule 404(b), a consideration of whether the evidence could have also been admitted as part of any "res gestae"—that is,

### B.

Defendants next contend that, irrespective of our conclusion regarding the "intent" exception to Rule 404(b), the district court abused its discretion in failing to exclude the Lowell evidence on Fed.R. Evid. 403 ground of undue prejudice. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The rule has not proven an especially fertile source of assistance to criminal defendants. As the Fourth Circuit has noted,

Undue prejudice would seem to require exclusion only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.

*United States v. Masters*, 622 F.2d 83, 87 (4th Cir.1980) (quoting Trautman, "Logical or Legal Relevancy—A Conflict in Theory," 5 Vand.L.Rev. 385, 410 (1952)). Other courts have echoed this sentiment. *See, e.g., United States v. Pirolli*, 673 F.2d 1200, 1203 (11th Cir.1982) ("... the application of Rule 403 must be cautious and sparing."); *accord United States v. McRae*, 593 F.2d 700, 707 (5th Cir.1979). Given these widespread standards, we see no merit in defendants' contention that the district court abused its discretion in admitting the Lowell evidence.

### C.

At the close of trial, defendant Zeuli asked the court to instruct the jury that "if you find the defendant Zeuli was himself a victim of extortion in this case, you may not find him guilty as an aider or abettor to the offense" and "in order to find the defendant Zeuli guilty as an aider and abettor, you must find beyond a reasonable doubt that

whether the Lowell evidence was "inextricably entwined" with the Watertown evidence—be-

he was not the agent of the victim." The court refused the request. Zeuli claims such a refusal constitutes reversible error.

In general, a defendant is entitled to an instruction on his theory of the case if (a) there is evidence to support it, and (b) it is appropriate in form and substance. *United States v. Leach*, 427 F.2d 1107, 1112–13 (1st Cir.1970). As we noted recently, however, "there is no obligation to charge with respect to circumstances not conceivably made out." *United States v. Taylor*, 683 F.2d 18, 21 (1st Cir.1982).

Zeuli's imaginative attempt to paint himself as a mere "bystander" to the extortion of subcontractor Arista simply does not reflect the undisputed facts of this case. Zeuli initiated and consummated the arrangements for the payment to Terranova. Zeuli initiated and masterminded the kickback to himself of $25,000. We have been directed to no place in the record that supports the contention that Zeuli was a victim of the extortion rather than a perpetrator of it. The district court thus properly refused to give the requested instruction.

The judgments are affirmed.